Napoleon **CHISHOLM, Herman Rushing, Alfred A. Hart, Jr., William McCombs, William H. Holman, James M. Little, John A. Pettice, James F. Lee, Norman A. Mitchell, Roy Dixon, Jr., Tom McGill, Milton J. Yongue, Sr., Peggy F. Talbert, Oren McCullough, Clarence Morgan, John T. Harrison, Wade Mosley, Appellees,**

v.

**The UNITED STATES POSTAL SERVICE, A. Shaw, Officer in charge of the Charlotte Postal Service; E. T. Klassen, Postmaster General of the United States; Michael R. Greeson, Director of Personnel of the Charlotte Branch of The United States Postal Service, Appellants.**

No. 80–1800.

United States Court of Appeals,
Fourth Circuit.

Argued July 15, 1981.
Decided Nov. 25, 1981.

David G. Karro, U. S. Postal Service, Washington, D. C. (Stephen E. Alpern, Associate Gen. Counsel, David Fishman, U. S. Postal Service, Washington, D. C., on brief), for appellants.

Jonathan Wallas, Charlotte, N. C. (Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, P. A., Louis L. Lesesne, Jr., Gillespie & Lesesne, Charlotte, N. C., Jack Greenberg, Bill Lann Lee, Beth J. Lief, New York City, on brief), for appellees.

Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

Napoleon Chisholm and other named plaintiffs brought this class action on behalf of fellow black employees against the United States Postal Service in Mecklenburg County, North Carolina (USPS) for racially discriminatory employment practices. After a bench trial in 1979, the district court renewed the class certification; concluded that USPS was liable to the class under a disparate impact theory for discriminatory promotion practices and liable to certain individual plaintiffs under a disparate treatment theory for discrimination in pro-

motion; and awarded extensive injunctive relief to the class, as well as providing for later remedial proceedings for assessment of individual damages. With the exception of the determination of liability in favor of class member Rushing on one of his claims of discrimination and award of relief to him on that claim, we affirm the district court's decision. 516 F.Supp. 810.

## I. *Background*

The USPS in Mecklenburg County, comprised of the main Charlotte post office, several other post offices in the county, and various branch stations, is a large federal employer, and historically it has played an important role in providing jobs for black persons. At times relevant to this case, about thirty percent of USPS employees in Mecklenburg County were black. The overall percentage of black employees, however, does not tell the whole story, for black employees have held a disproportionately large number of lower level jobs, called "craft" jobs, and have been represented poorly in upper level management and supervisory positions.[1] This disparity precipitated the class action brought by Chisholm.

Chisholm, hired by USPS in 1957 as a temporary mail carrier, was a regular mail carrier at the time he instituted administrative proceedings for racial discrimination pursuant to United States Civil Service Commission regulations.[2] On March 24, 1972, he filed a formal administrative complaint, alleging that USPS had unfairly denied him the opportunity to compete for the higher level positions of finance examiner and budget assistant. The complaint also alleged that black employees at USPS in Mecklenburg County as a class had been discriminated against from 1960 through the time of this complaint. A hearing on the complaint was held at Chisholm's request, during which evidence both of Chisholm's specific claims and of class-wide discrimination was presented. The hearing examiner found that Chisholm was improperly denied consideration for the position of budget assistant and concluded that a preponderance of the evidence supported the allegation of discrimination based on race. The national USPS office of Equal Employment Compliance accepted the hearing examiner's proposed findings and decision, and the Board of Appeals and reviews affirmed the rulings. Despite Chisholm's efforts, the claim of class-wide discrimination was never addressed at any administrative level.

His administrative remedies having been exhausted, Chisholm filed this lawsuit on January 27, 1973; the complaint charged violation of the Fifth Amendment, 42 U.S.C. § 1981, and section 717(c) of Title VII, 42 U.S.C. § 2000e–16(c). Chisholm sought to represent in the class action "all black persons who have been or who may have been affected by the unlawful employment practices complained of herein at the facilities of defendant United States Postal Service located in Mecklenburg County, North Carolina." He specifically alleged that USPS refused to consider him for the positions of budget assistant and finance examiner because of his race and that it was USPS's policy to refuse to grant promotions to blacks, to prevent blacks from attaining supervisory positions, and to exclude blacks from the promotion board, all

---

1. Employees at the USPS in Mecklenburg County normally were hired into various functional craft positions of clerk, city carrier, vehicle operator, vehicle maintenance, mail handler, and rural mail carrier, with each position having a separate seniority roster and collective bargaining agreement. Each job was assigned a pay level, and each level had a number of pay steps through which employees advance according to length of service. These craft positions were at level 6 and below. Craft lower level vacancies were filled by a bidding system principally based on craft seniority pursuant to collective bargaining agreements. Craft jobs normally were filled by the "senior qualified" employee. On the other hand, initial level supervisory positions were supposed to be filled by the "best qualified" employee. Before March 5, 1973, these initial level supervisory positions were designated levels 7, 8, and 9 and were redesignated levels 15, 16, and 17 on that date. Management level supervisory positions were at levels 10 and above (18 and above after March 5, 1973).

2. 5 C.F.R. § 713.214 (1972) (currently codified at 29 C.F.R. § 1613.214 (1980)).

because of race. Five other black employees—H. C. Rushing, William J. McCombs, C. A. Rickett, Milton J. Yongue, and James F. Lee—subsequently moved to intervene as parties plaintiff. They filed a complaint in intervention, which added to Chisholm's complaint the allegation that USPS maintained a policy of discrimination against blacks with respect to "details"[3] and other temporary promotions.

The district court, 516 F.Supp. 810, subsequently allowed the motion to intervene, ruled that the action should proceed as a trial de novo under Title VII,[4] and certified a class defined as

> all black persons who are employed and who might be employed by the defendants at the Charlotte, Mecklenburg County, North Carolina branch of the United States Postal Service and who are or have been limited, classified, restricted, discharged, excluded or discriminated against by the defendants in ways which deprive or tend to deprive them of employment opportunities and otherwise affect their status as employees or applicants for employment or promotion because of their race or color.

The case proceeded to trial in August 1979. After the plaintiffs' presentation of statistical and testimonial evidence to show that the USPS promotional system was discriminatory and USPS's presentation of statistical and testimonial evidence in rebuttal, the district court ruled in favor of the plaintiffs.

The district court found under a disparate impact theory that the promotional system for higher level jobs, although facially neutral, was discriminatory. All of the challenged versions of the initial level supervisory examination—an important feature of the promotional system—had a statistically significant disparate impact on black employees, the evidence of which was not rebutted by any proof by USPS that the tests were valid. Similarly, the detailing system, whereby employees gained both specialized and general experience in higher level positions helpful to eventual promotion to those positions, was discriminatory. Deviation by USPS officials from specialized and generalized experience requirements to the detriment of black applicants and to the benefit of white applicants, and also deviation from standard procedures to avoid the selection of black employees were also found to be discriminatory components of the promotional system. Promotion determinations of the promotion advisory board, a key body in the promotion process, and the postmaster were subjective, standardless, and favored white applicants. The administration of discipline—not guided by any objective criteria—disproportionately penalized black employees and adversely affected their prospects for promotion. Again, USPS offered no evidence justifying the disparate impact. Finally, black employees were excluded from management training positions prior to 1978 and rural route carrier positions prior to 1979.

Evidence of discrimination in promotion against certain individuals under a disparate treatment theory of liability buttressed the plaintiffs' statistical evidence. Upon this evidence the district court also ruled in favor of seventeen persons with individual claims of discrimination.

The judgment entered by the district court enjoined USPS from discriminating against the class in the areas of promotion, details, examinations, discipline, and pay. The court narrowed the class at that time to include only black employees from March

---

**3.** A detail is a temporary assignment of a postal employee to a higher level position. It produces an immediate increase in pay, and more importantly, it gives the employee an opportunity to get both specialized and general experience which he could then cite as a factor in his favor when the vacancy was ultimately filled on a permanent basis.

**4.** The Supreme Court's decision in Chandler v. Roudebush, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), established the propriety of the district court's ruling that litigation of Chisholm's claim should proceed de novo. The district court also had ruled that section 1981 supplied alternative jurisdiction for the suit but later decided to the contrary in light of the Court's decision in Brown v. GSA, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).

24, 1970, who had been subject to discrimination in promotions, details, use of tests, discipline, or pay. The court also awarded back pay to each plaintiff or class member who is able to establish entitlement to it in stage II proceedings. Specific relief was ordered in the seventeen individual cases, with the details of the awards to be determined by a master. The court enjoined USPS to make "affirmative efforts" to recruit, appoint, and promote qualified black persons, using as a goal the percentage of black employees at USPS. USPS also was ordered to make extensive reports of its future policies; to formulate objective criteria for promotions, details, and discipline; to establish a new position of EEO Employee Complaints Representative; to use only validated written tests or new selection devices; and to pay an interim award of attorneys' fees.

On appeal, USPS challenges the class description, certification and representation; it also argues that the district court erred in ruling in favor of the class on the issue of liability, erred in five instances in ruling in favor of the seventeen individual plaintiffs, and abused its discretion in awarding injunctive relief.

## II. Class Issues

Upon conclusion of the trial, the district court renewed its certification of the class under Fed.R.Civ.P. 23(b)(2) and narrowed class membership to exclude black applicants for jobs. The class as reconstituted was defined as

[a]ll black persons who have been employed by the defendants at the Charlotte and Mecklenburg County, North Carolina facilities of the United States Postal Service (or the United States Post Office) at any time from March 24, 1970 to the date of this Order who are or have been limited, classified, restricted, discharged, ex-

cluded or discriminated against by the defendants with respect to promotions (including all components of the promotion process), details, the use of written tests, discipline, or pay or who have been otherwise deprived of employment opportunities related to said factors because of their race or color.

Several of USPS's arguments we view as being related to the larger question of the propriety of the definition and certification of the class, and, for the sake of convenience, we address them as parts of a whole. The specific challenges asserted are (1) that the class should not have included members who had claims of discrimination as far back in time as March 24, 1970; (2) that Chisholm's administrative complaint did not give notice of the types of discriminatory practices later litigated in the class action; (3) that the class as certified was too broad; and (4) that Chisholm was not a proper class representative. We address each of these contentions in turn.

### A. Inclusion of Individuals with Claims Dating Back to March 24, 1970

Chisholm filed his administrative complaint on March 24, 1972, which was also the effective date of the Equal Employment Opportunity Act of 1972[5] (the Act) amending Title VII of the Civil Rights Act of 1964.[6] Section 717(c) of the Act, 42 U.S.C. § 2000e–16(c), created a new remedy for federal employees' enforcement of their existing right to be free from racial discrimination in employment contained in the Constitution, statutes, and Executive Order No. 11478.[7] *Koger v. Ball*, 497 F.2d 702 (4th Cir. 1974). Section 717(c) provides that, after an aggrieved employee has exhausted administrative remedies on a complaint brought pursuant to Executive Order No. 11478 (or any succeeding executive or-

---

5. Pub.L.No.92–261, 86 Stat. 103 (1972), 42 U.S.C. § 2000e *et seq.* (1972).

6. Pub.L.No.88–352, 78 Stat. 253 (1964) (prior to 1972 amendment).

7. Executive Order No. 11478 affirms the government's policy of assuring equal opportunity in federal employment to persons of all races. It became effective on August 8, 1969. 3 C.F.R. Ch. 2, pp. 133–35 (1969 President's Compilation). *See* 42 U.S.C. § 2000e (1976) (historical note).

ders), he may file a civil action against the head of the government department, agency, or unit in question.[8]

USPS does not contest the district court's recognition of Chisholm's individual claim as timely under section 717(c), as he had a pending claim on March 24, 1972, when section 717(c) became effective. *See Koger v. Ball*, 497 F.2d 702 (4th Cir. 1974). Neither does it dispute that section 706(g) of Title VII, 42 U.S.C. 2000e–5(g), allows back pay liability to accrue for Chisholm from March 24, 1970 (two years prior to the filing of his administrative complaint).[9] It does take issue, however, with the district court's inclusion in the class of employees who suffered discrimination within the two years before the March 24, 1972, filing date.

■ We conclude that the district court, with one exception, properly allowed under section 717(c) individuals with claims of discrimination back to March 24, 1970 to be included in the class.[10] In *Koger v. Ball, supra*, this court held that a federal employee's claim of discrimination occurring prior to the effective date of the 1972 amendment to Title VII could be litigated under section 717(c) if it was pending on March 24, 1972. Chisholm's claim, therefore, is encompassed by our decision in that case. Further, we find no justification for drawing a distinction between a claim such as that of Chisholm, in which the discrimination occurred prior to the enactment of the 1972 amendment when a claim was pending on March 24, 1972, and a claim of pre-

8. Section 717(c), 42 U.S.C. § 2000e–16(c) (1976), provides:

Within thirty days of receipt of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Civil Service Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Civil Service Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e–5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

9. Section 706(g), 42 U.S.C. § 2000e–5(g) (1976), reads:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful

employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

10. In light of this holding, it is unnecessary to rule on the argument made by USPS that plaintiffs have no remedy under the Fifth Amendment. While there may be some basis for this argument, *see Davis v. Passman*, 442 U.S. 228, 247, n.26, 99 S.Ct. 2264, 2278, n.26, 60 L.Ed.2d 846 (1979); *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *but see Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *Hanson v. Hoffman*, 628 F.2d 42, 21 FEP 1645, 1649 (D.C.Cir.1980), whether plaintiffs have a Fifth Amendment claim or not makes no difference in the outcome of this case. A complete remedy is available to the plaintiffs under Title VII. *See* 42 U.S.C. § 2000e–16(d) (1976). We, therefore, decline to rule on the question whether Title VII provides an exclusive remedy in this context.

amendment discrimination when no charge had been filed on that date. *See Huntley v. Department of Health, Education and Welfare*, 550 F.2d 290, 295–96 (5th Cir. 1977); *Chewning v. Schlesinger*, 471 F.Supp. 767, 772–75 (D.D.C.1979). Therefore, that Chisholm had pending a claim of pre-amendment discrimination on March 24, 1972, while other class members did not, is of no special importance.[11]

We further do not consider it significant that class members other than Chisholm had not exhausted their administrative remedies at the time this action was filed. The Supreme Court indicated in *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), that federal employees are to be accorded the full rights available to litigants in the private sector under Title VII. Because private sector employees may maintain a class action without filing their own claims so long as the named plaintiff has exhausted administrative remedies, *Wheeler v. American Home Products Corp.*, 582 F.2d 891 (5th Cir. 1978); *Inda v. United Air Lines, Inc.*, 565 F.2d 554 (9th Cir. 1977), *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978), we conclude that federal employees under section 717(c) must be granted the same right to pursue a class action upon exhaustion of remedies by one named plaintiff. *See Eastland v. Tennessee Valley Authority*, 553 F.2d 364 (5th Cir.), *cert. denied*, 434 U.S. 985, 98 S.Ct. 611, 54

L.Ed.2d 479 (1977); *McLaughlin v. Hoffman*, 547 F.2d 918 (5th Cir. 1977). Because Chisholm met the exhaustion requirement, the suit properly could be maintained as a class action.

The district court's inclusion of individuals with claims of pre-1972 amendment discrimination in the class was therefore proper. The court, moreover, correctly set the cut-off date at March 24, 1970. That is the date, under section 706(g), from which Chisholm could earn back pay: section 706(g) allows accrual of back pay for two years prior to the filing of a charge of discrimination, which occurred in this case on March 24, 1972. As Chisholm's administrative complaint alleged claims of class-wide discrimination, the timetable for back pay established by that complaint is applicable to the class as a whole. *See Chewning v. Schlesinger*, 471 F.Supp. 767, 775–76 (D.D.C.1979).

We must, however, make one exception to our conclusion that all class members' claims of discrimination after March 24, 1970 were properly encompassed by the class action. Rushing, a named plaintiff, filed an administrative complaint in 1971, charging that he had been denied a detail to a position as a Civil Service Examiner in 1971. The Civil Service Commission determined that Rushing's race accounted for his being denied the detail and closed the case on February 29, 1972. Because Rushing

11. USPS argues that under 5 C.F.R. § 713.-214(a)(1) (1972) (currently codified at 29 C.F.R. § 1613.214 (1980)) all federal employees with employment discrimination claims were required to file those claims with the EEOC within fifteen days of the personnel action they wished to challenge. Any class member whose claim was over fifteen days old at the time Chisholm filed his claim, USPS asserts, was time-barred. As authority for this argument, USPS relies on *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), which held that a plaintiff could not represent a class with members whose claims were barred by the 210 day statute of limitations contained in section 706(d) of Title VII, 42 U.S.C. § 2000e–5(d) (1972) (The statute of limitations was extended subsequently by Congress to 300 days, Pub.L.No.92–261 § 4(a), 42 U.S.C. § 2000e–5(e) (1976)). The court in *Wetzel*

therefore was faced with a statute of limitations which is jurisdictional because it is contained in Title VII itself. *See Doski v. Goldseker*, 539 F.2d 1326 (4th Cir. 1976).

The limitation period USPS asserts, however, is an administrative regulation for initiating administrative claim procedures. Since class members are not required to exhaust their administrative remedies, we are not prepared to hold that section 713.214(a)(1) bars class members' claims. *See Ettinger v. Johnson*, 556 F.2d 692, 697–98 (3d Cir. 1977). Even if we were to hold that the limitation period contained in section 713.214(a)(i) is enforceable in this case, the allegations and proof of the continuing nature of Title VII violations by USPS preserved the existing class members' claims until the statute of limitations was tolled by the filing of Chisholm's complaint. *See Patterson v. American Tobacco Co.*, 634 F.2d 744, 751 (4th Cir. 1980).

received a final agency determination on this claim prior to March 24, 1972, he lacked independent standing to maintain an action on a section 717(c) claim. He thus could not litigate the defunct claim in the class action. *See Eastland v. Tennessee Valley Authority, supra.* The relief on this claim granted by the district court therefore must be vacated. Rushing's claims of discrimination after March 24, 1970, which were not addressed by his 1971 administrative complaint are of course not affected by this ruling.

### B. *The Administrative Complaint*

USPS also argues that Chisholm's administrative complaint failed to charge certain discriminatory practices that eventually were addressed in the litigation of this case. The argument by implication is that those class members who had claims not covered by Chisholm's administrative complaint should not have been included in the class. Specifically, USPS asserts that, while the administrative complaint alleges discrimination in promotion and detailing, it does not allege discrimination in such areas as discipline and testing.

 We find no merit in the argument. The allegation in the administrative complaint that USPS discriminated in promotions sufficed to put USPS on notice that the entire promotional system was being challenged, including aspects of the system such as discipline and testing which were not specifically enumerated in the complaint. An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination. *See Equal Employment Opportunity Commission v. General Electric Co.*, 532 F.2d 359 (4th Cir. 1976); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970). Administrative investigation of various components of the USPS promotions system could reasonably be expected to occur in light of Chisholm's complaint, and, in several instances, the investigation of the complaint did touch upon specific features of the system, for example, testing and discipline, not raised in the complaint. The scope of the class action—and, accordingly, the class—therefore did not exceed the limits set by the allegations of Chisholm's administrative complaint.

### C. *Scope of the Class*

USPS also takes issue with the scope of the class certified by the district court. The argument in essence is that, as of the conditional certification of the class in 1975, "the lawsuit had no shape." It protests that the class was so broad that it could not properly defend the suit or even understand the issues that had been resolved by litigation.

To protect a defendant from having to defend against a class action that is so broad based that it subjects the defendant to a multitude of divergent claims in one lawsuit, Fed.R.Civ.P. 23 requires that there be common questions of law or fact among the class members. These common questions of law and fact focus the discovery and trial of the case and give the lawsuit its "shape." The plaintiff, in his complaint, is thus required to provide the defendant with " 'the essential information necessary to determine both the subject matter and size of the litigation.' " *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 392–93, 97 S.Ct. 2464, 2469, 53 L.Ed.2d 423 (1977) (quoting *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 555, 94 S.Ct. 756, 767, 38 L.Ed.2d 713 (1974). While Chisholm's administrative complaint and complaint in district court did not specifically address disciplinary practices, the rural carrier workforce, or written examinations, they did raise the issues of promotion and detailing. The complaints, therefore, put USPS on notice that the subject matter of the suit was discriminatory promotion policies affecting black employees. The record shows that both disciplinary practices and written examinations are part of the promotion issue and need not be addressed individually in the complaint. The complaint, therefore, gave the defendants adequate notice of the

scope of the subject matter of the class action.

■ USPS contends, however, that the class itself is too broad. To support this argument, USPS points out that the class, as first defined, included both blacks employed at the Charlotte post office and blacks who were potential employees, who had been subjected to any discriminatory employment practices, not limited to the area of promotion. The record reveals, however, that as litigation progressed, the district court appropriately narrowed the definition of the class to include only black employees employed from March 24, 1970, who suffered employment discrimination related to promotions. We cannot say that the district court erred or that USPS was prejudiced by the district court's decision not to narrow the class sooner than it did. This conclusion is bolstered by USPS's admission in oral argument that it did not move to decertify the class after all Chisholm's evidence was presented, nor did it object to evidence admitted under the class definition as the case proceeded.

■ Since USPS was not prejudiced by the manner in which the district court narrowed the class definition, the proper question here is whether the class, as finally defined by the district court, met the commonality requirements of Fed.R.Civ.P. 23. Clearly, the district court was correct in concluding that the Fed.R.Civ.P. 23(a)(2) requirement of common issues of law or fact was met by the existence of the issue "whether the USPS has discriminated against black employees in the denial of promotions and promotion opportunities by means of detailing, written tests, discriminatorily applied selection procedures, and illegal and discriminatory discipline, among other things." Further, evidence in the record of systematic discrimination against blacks in promotion opportunities meets the requirement of Fed.R.Civ.P. 23(b)(2) that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

Two other issues concerning the scope of this class are raised by our decision in *Stastny v. Southern Bell Tel. & Tel. Co.*, 628 F.2d 267 (4th Cir. 1980). In that case, the court reversed the district court's certification of a statewide class of Southern Bell employees because the record indicated that there was substantial autonomy of management in the various local Southern Bell facilities across the state and because the record did not support the inference that there was a statewide labor pool for positions at the local facilities. These factual conclusions indicated a lack of commonality among members of the statewide class and thus warranted decertification. *Id.* at 278–79. In this case, however, members of the class—although spread out in various branches in Charlotte and Mecklenburg County—all worked for the Charlotte post office and under the same management. The relevant pool of employees from which management positions at the post office were filled is essentially city- and county-wide. These facts clearly distinguish this case from *Stastny.*

A final factor mentioned in passing in *Stastny* is the probability that similar conditions prevailed throughout the period of litigation. *Id.* at 277. The claims included in the class here cover nearly a decade. Given the strength of the evidence of discrimination based on a disparate impact theory, however, the length of time of litigation in this case did not substantially lessen the probability that similar conditions prevailed throughout the period. The evidence does show that promotion opportunities for blacks increased and improved as time went on, partly at least as the result of the initiation and pendency of the lawsuit. The evidence, however, does not show that discriminatory practices ceased at any point.

We, therefore, hold that the commonality requirements of Fed.R.Civ.P. 23 have been met and that the class certification was proper.

D. *Adequacy of Chisholm as a Class Representative*

■ A final class-related issue raised by USPS is whether Chisholm was an adequate

class representative. The general thrust of USPS's argument is that Chisholm did not have sufficient similarity of interest and injury with the interests and injuries of the class members, and, therefore, was not an appropriate class representative.[12] Although there appears to be some conflict of authority among the circuits concerning the required degree of similarity of interest and injury between the class representative and the class members, we conclude that under either line of authority, Chisholm was an appropriate class representative for the class as modified by the district court at the time of its judgment.

The starting point for the class representative requirement is found in Fed.R.Civ.P. 23(a)(3) and (4), which requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class," and that "the representative parties will fairly and adequately protect the interest of the class." The Supreme Court has reiterated the proper test for these requirements as whether "the class representative [is] part of the class and 'possess[es] the same interest and suffers the same injury' as the class members." *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (quoting *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974)).

There is a dispute among courts about whether the test as stated in *Rodriguez* allows an "across-the-board" attack on an employer's employment practices (under which a plaintiff who has suffered only one form of discrimination, such as in promotion, would be permitted to represent a class of all persons, however situated, who are injured by any of the employer's discriminatory policies) or whether *Rodriguez*, under the "same impact" doctrine, limits the class to those persons who have suffered injuries of the "same impact" as that of the class representative (for example, a discriminatory refusal to promote or transfer).[13] Whether this circuit chooses to follow the "across-the-board" rule or to apply the "same impact" doctrine[14] makes no difference in the present case.

Chisholm's complaint alleges USPS discriminated against him because of his race by denying him equal promotion opportunities. On at least five occasions, Chisholm unsuccessfully sought promotions to a number of different supervisory positions. In his quest, he took a supervisory examination and a test for management trainees, only to be told that he had failed. While he never affirmatively sought a detail, he did not receive a detail until June 30, 1973, four days after he filed this lawsuit. The district court also found that he demonstrated an interest in receiving promotion details by "his efforts on the supervisory examinations." He lost his bids for promotion to finance examiner, budget assistant, manager-accounting and reporter-systems, and manager-budget and cost analysis to white

**12.** USPS also contends that because Chisholm was awarded a promotion to the next high level vacancy, with front pay until such promotion, his interests became antagonistic to the interests of other class members. USPS, however, presents no evidence to support any actual conflict of interests. *See Social Serv. Union Local 535 v. County of Santa Clara*, 609 F.2d 944 (9th Cir. 1979). Chisholm should not be disqualified from representing the class on such a hypothetical basis. Even if there are competing equities among the plaintiffs and relief is limited, a master can make equitable apportionment of it. *See White v. Carolina Paperboard Corp.*, 564 F.2d 1073 (4th Cir. 1977).

**13.** *See Vuyanich v. Republic Nat. Bank*, 505 F.Supp. 224, 235–36 (N.D.Tex.1980); *The Proper Scope of Representation in Title VII Class*

Actions: A Comment on East Texas Motor Freight System, Inc. v. Rodriguez, 13 Harv.C. R.–C.L.L.Rev. 175, 177 (1978).

**14.** *Compare Barnett v. W. T. Grant Co.*, 518 F.2d 543, 598 (4th Cir. 1975) (district court erred in not allowing plaintiff who had suffered injury from some of defendants' discriminatory policies to represent class of persons "who have suffered from different actions motivated by the same policies"); *with Hill v. Western Elec. Co., Inc.*, 596 F.2d 99, 102 (4th Cir. 1970), cert. denied, 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979) (*Rodriguez* "is not broad enough to permit a named representative to represent a class of people who suffered different injury or those having similar claims but who are employed in other facilities.").

employees who had been detailed to those positions for substantial periods of time before the vacancies were permanently filled. He was the victim of disciplinary actions for offenses for which white employees were not punished. His failure to pass the initial level supervisory examination excluded him from the supervisory register or list, and hence from consideration when promotions were being made. A level 9 position was denied to him because he had not worked at a level of difficulty no less than three levels below level 9, although this requirement was repeatedly waived for white applicants. At least one time, he was unable to bid for a position as senior postal assistant examiner when an excessed employee [15] was moved into the job without the job being put up for bids. He appeared before and was interviewed by an all white promotions advisory board. He was hindered by requirements that were imposed in some instances and ignored in others. In short, Chisholm personally experienced most of the discriminatory practices and patterns complained of by the members of the class.[16] He might not have fallen prey to all the ills that the class flesh was heir to, but if he was not an appropriate class representative it is difficult to imagine a more appropriate one.

Chisholm claims to represent a class of black employees of the Charlotte and Mecklenburg County post office who, from March 24, 1970, have suffered discrimination related to promotion. Whether *Rodriguez* is construed in a broad or narrow manner, Chisholm clearly possessed the same interests and suffered the same injury as members of the class. We conclude, therefore, that Chisholm was a proper class representative under either the "across-the-board" or "same impact" approach. The battle over which approach this circuit should adopt in subsequent cases must be fought on other factual terrain.

### III. Determination of Liability to the Class

To meet their burden of establishing a prima facie case of racial discrimination in promotions, the plaintiffs produced voluminous statistical evidence. These figures indicated that the number of blacks promoted to higher level supervisory and managerial jobs-level 7 (later level 15) and above—was grossly disproportionate to the number of blacks in the total work force.[17] In

---

**15.** An excessed employee is one whose job in a particular post office is no longer needed and who is transferred to some other post office.

**16.** Although USPS asserts that assignment to rural carrier positions is not part of the promotion process, the evidence establishes that a rural carrier position is a highly desirable position. Such assignments are, for all practical purposes, promotions. Employees with claims of discriminatory denials of such positions are thus properly part of the class. Because Chisholm personally experienced all other aspects of the promotion process, the fact that he did not apply for a rural carrier position is not significant.

**17.** For example, for the years 1972 to 1978, promotions to job level 7 and above reflected:

| | Total Promotions | Blacks | Whites |
|---|---|---|---|
| 1972 | 43 | 2 | 41 |
| 1973 | 42 | 4 | 38 |
| 1974 | 56 | 7 | 49 |
| 1975 | 26 | 3 | 23 |
| 1976 | 12 | 1 | 11 |
| 1977 | 6 | 1 | 5 |
| 1978–1979 | 23 | 7 | 16 |

From March 23, 1972 to June 30, 1973, USPS's own statistics show the following promotions:

| Level * | Whites Promoted | Blacks Promoted |
|---|---|---|
| 7 | 6 | 0 |
| 8 | 10 | 1 |
| 9 | 4 | 0 |
| 11 | 1 | 0 |
| 12 | 2 | 0 |
| 16 | 1 | 0 |
| 18 | 1 | 0 |
| 19 | 0 | 1 |

*Footnote 1 contains a general explanation of these various levels.

From June 30, 1973 to December 31, 1975, USPS's figures reveal these promotions:

| Level | Whites Promoted | Blacks Promoted |
|---|---|---|
| 7 | 2 | 0 |
| 8 | 3 | 0 |
| 11 | 4 | 1 |
| 12 | 1 | 0 |
| 13 | 2 | 0 |
| 14 | 4 | 1 |
| 15 | 22 | 6 |
| 16 | 8 | 1 |

addition to the statistics, the plaintiffs called 20 former and present black employees of USPS. These witnesses testified about their educational and employment backgrounds and attainments, and their unsuccessful efforts to obtain promotions and details in the USPS in Mecklenburg County. In connection with their personal experiences, they demonstrated that USPS, during at least a part of the pertinent period, followed practices of (1) utilizing various tests to determine eligibility for promotions; (2) employing a supervisory register which adversely affected promotional opportunities;[18] (3) having white employees detailed to higher level positions before it was generally known that vacancies existed;[19] and (4) allowing white supervisors to select cronies for details and later to serve on the promotion boards which made recommendations for filling the permanent vacancies. Some of these witnesses asserted that they had been denied the right to take tests, or that when they took the required tests, they were advised that they had failed to pass,[20] and hence were ineligible for consideration for promotion. Two expert witnesses examined the test results and other related statistics, using a chi square analysis[21] and the "four-fifths rule,"[22] and opined that the differences between the passing rates of whites and blacks were statistically significant and could not have occurred by chance more than one time in a thousand. It is highly probable, therefore, that something other

| Level | Whites Promoted | Blacks Promoted |
|---|---|---|
| 17 | 7 | 0 |
| 18 | 10 | 2 |
| 19 | 3 | 1 |
| 20 | 7 | 0 |
| 21 | 2 | 0 |
| 22 | 1 | 0 |
| 23 | 1 | 0 |
| 27 | 1 | 0 |

Even if we employ figures supplied by USPS, the statistical evidence of racial discrimination in promotions is compelling. There were 114 promotions to levels 7–9 (levels 7–15 after March 1973) during the period from 1970–1975. Of these, 14 went to blacks who made up 30% of the labor pool. Thus, the actual number of promotions (14) deviates from the expected number (34.2) that black employees would have received had there been a nondiscriminatory system. This statistical disparity is 4.128 (4.13) standard deviations, and it presents a prima facie case of discrimination. A fluctuation of more than two or three standard deviations undercuts the hypothesis that decisions were being made randomly with respect to race. See Castaneda v. Partida, 430 U.S. 482, 496, 97 S.Ct. 1272, 1281, 51 L.Ed.2d 498 (1977); Hazelwood School District v. United States, 433 U.S. 299, 311, 97 S.Ct. 2736, 2743, 53 L.Ed.2d 768 (1977); EEOC v. United Virginia Bank, 615 F.2d 147 (4th Cir. 1980). Plaintiffs' figures are even more compelling. Only 5 of 50 promotions above level 9 (above level 15 after March 1973) went to blacks between March 24, 1972 and December 31, 1975.

18. At all times while this register was in use, an applicant to be considered for a promotion had to have his name in the register. To be in the register, he at a minimum had to have passed a written test. At other times, additional conditions were imposed: the applicant had to be in the "zone of consideration," i. e., in the top 15% on the register or he had to have a test score above a pre-determined "cut off" figure. Later, choices were made in the order in which the names appeared on the register. Since blacks generally had difficulty in passing the tests, and those who did were usually not at the top of the list, all of these devices diminished their chances for promotion.

19. Between 1970 and 1978, out of 295 details at level 10 or above, eight (or three percent) went to blacks. From levels 11–17, with one exception, blacks were completely excluded.

20. With specific reference to the tests employed by USPS, the plaintiffs established that on the 1970 OS/100 test, 44.4% of the white test takers passed, while only 18.2% of the blacks did so. On the 1970 re-opened examination, the passing rate was 60.5% for whites, and only 14.9% for blacks, while in 1974 the figures showed that 58.0% of the whites achieved a passing score while only 25.3% of the blacks were successful.

21. A chi square statistic reflects differences in the passing rate of one group versus another and allows one to determine whether those differences are statistically significant.

22. The "four-fifths rule" is an administrative rule of thumb used by agencies concerned with Title VII cases. It offers a definition of what is a serious difference in the passing rates for protected classes. If the selection rate for a protected class is less than 80% of the selection rate for the group selected at the highest rate, that constitutes adverse impact.

than the ability that these tests were supposed to measure was skewing the results. That "something," in their view, was race.[23] The plaintiffs' proof also tended to show that they were subjected to unequal discipline,[24] administered without recognizable standards, and that requirements for promotion often were waived or insisted upon, depending upon the result being sought.

The totality of the plaintiffs' evidence demonstrates beyond peradventure that all of the matters considered (details, discipline, tests, registers, promoting boards, and the lack of written policies and standards) directly related to promotions and influenced for good or for ill an employee's chances to advance at the USPS facilities in Charlotte.

It is somewhat difficult to determine exactly what USPS was seeking to demonstrate by its evidence. The district court recognized this problem, and found that

USPS has evidently rested its case on a claim that longer service alone explains the disparity in the promotion rates between blacks and whites. That explanation falls short for several reasons. First, the evidence was offered by a personnel assistant who reviewed the records in the preparation for litigation. There was no effort by USPS to demonstrate that the members of the Promotion Advisory Boards or the selecting officials used any objective factor, seniority or otherwise. Second, the USPS evidence went only to isolated cases and failed to explain the opposing disparity where less senior whites were promoted over more senior blacks. While seniority may be a factor in acquiring the skills necessary to perform the higher level positions, seniority does not provide an automatic promotion to "best qualified" jobs. There has been no showing of the actual skills and knowledge of those selected compared to those blacks denied positions. This is not a case like *Hill v. Western Electric Co.*, 596 F.2d 99, 106 (4th Cir. 1979) where only a small percentage of blacks in the work force had any significant amount of experience with the employer. The evidence in this trial demonstrated that blacks have long been represented in large numbers in the USPS work force. Where the defendant had cited a white's longer service, the black employee had had a significant number of years of service. In those circumstances, experience assumes less and less importance. Moreover, blacks are better educated than whites, and USPS personnel rules made it clear that education is valued at the Post Office.

Finally, where experience has been gained through disparate treatment evidenced by discrimination in detailing, blacks should not be made to suffer because of the USPS's historical discriminatory practices.

Record, tab No. 188, at 112–13.

The district court in a 125 page opinion carefully analyzed and evaluated the evidence offered by both parties. It declared that the plaintiffs had made out a prima facie case of racial discrimination on theories both of disparate impact[25] and of disparate treatment.[26] It then held that

---

**23.** In response to these challenges to the tests, nothing was offered to justify the tests or the various cut-off scores. USPS ultimately conceded that a determination was made that the results of the OS/100 type test had a discriminatory impact, and that it had been abandoned in 1974. At trial, despite a forecast to the contrary, no attempt was made to validate any of the tests employed by USPS.

**24.** A record of disciplinary action can adversely affect an individual's prospects for promotion. Although blacks comprised only 30% of the total work force, more than half of the suspensions involved blacks, and blacks were discharged twice as often as whites.

**25.** Disparate impact has been defined as a situation that " 'involves employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.' " *Wright v. National Archives & Records Serv.*, 609 F.2d 702, 711 (4th Cir. 1979) (quoting *International Bhd. of Teamsters v. U. S.*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977)).

**26.** Disparate treatment has been defined as a situation where " 'the employer simply treats some people less favorably than others because of their race, color, religion, sex, or national

USPS had failed to demonstrate either a legitimate, non-discriminatory reason for its actions or that its employment practices and procedures which excluded blacks were in any way related to job performance.

USPS did not specifically challenge any of the district court's findings of fact. Even if it had done so, however, we cannot say that any of the essential findings are clearly erroneous. With regard to the conclusions of law, we hold that the district court correctly held that the plaintiff met its burdens for establishing prima facie cases of racial discrimination both under a theory of disparate impact, *see Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and under a theory of disparate treatment, *see McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); that USPS failed to carry its burden of production on either theory; that no showing of pretext was required from the plaintiffs; and therefore that the plaintiffs were entitled to prevail at the liability stage of the trial. Accordingly, we affirm the judgment of the district court in these respects.

## IV. *Individual Relief*

In its memorandum opinion and judgment, the district court granted specific relief to seventeen named plaintiffs and intervenors. USPS objects to these awards in general terms, but in its brief it challenges only the decisions favorable to Chisholm, Lee, McCombs, Rushing and Yongue. Except for the 1971 claim made by Rushing, which is dealt with in Part II.A. of this opinion and held to be barred, the relief granted to the seventeen named employees was appropriate, and we affirm the actions of the district court relating to these individuals.

Essentially, USPS attacks the individual awards on these grounds: (1) McComb's and Rushing's claims were beyond the scope of Chisholm's administrative complaint; (2) the evidence failed to show that Yongue was denied a position because of unlawful discrimination; (3) there was no factual basis for the finding that Rushing was the best qualified applicant; (4) Chisholm's lack of experience for a financial position was not found to be pretextual; (5) there is no support in the record for Chisholm's 1971 claims; (6) Lee settled his only post-act claim; and (7) since the plaintiffs assert that Rushing was better qualified than McCombs, McCombs was not entitled to any relief.

■ Both Rushing and McCombs unsuccessfully sought promotions during the period in question. They failed the tests being administered by USPS and were thereby excluded from the supervisory roster. In addition, Rushing tried repeatedly to obtain details to a number of supervisory posts, but he never obtained one. Their claims clearly fall within the ambit of Chisholm's administrative complaint.

■ There is ample evidence to support the finding that Yongue was denied a position because of unlawful discrimination. Yongue was rated ineligible after taking the initial supervisory test on two occasions, despite the fact that he had a college degree. He attempted without success to obtain details to several supervisory positions in which he was interested, and whites who had been detailed to these same posts were chosen over Yongue when the vacancies were filled permanently.

■ It borders on the specious for USPS to say that there was no evidence to support the court's finding that Rushing was the best qualified candidate for the position of customer service representative in 1974. USPS's own witness testified that two members of the three person promotion board rated Rushing superior to or equal to Livingston, the white employee ultimately selected for the position, and the applicable administrative reports bear this out.[27] Liv-

origin.'" *Wright v. National Archives & Records Serv.*, 609 F.2d 702, 711 (4th Cir. 1979) (quoting *International Bhd. of Teamsters v. U. S.*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977)).

27. The Board member ranking Rushing and Livingston as equal commented that "Mr. Rushing has the experience and background necessary to be a CSR" and that "this man [Livingston] has a lot of potential." The third

ingston was first employed by the post office in June 1977, more than 10 years after Rushing came to work. Considering Rushing's seniority and his superior educational achievements, a rational fact finder could have found that he was the best qualified.

■ The district court was never called upon to address the issue whether Chisholm's alleged lack of experience for a financial position was pretextual. Having failed to sustain its burden of "articulating some legitimate non-discriminatory reason" for the denial of promotions to Chisholm, the plaintiffs were not called upon to demonstrate that the USPS's reasons were a pretext for discrimination. The district court ruled, and properly so, that Chisholm had carried his ultimate burden that USPS had intentionally discriminated against him on account of his race. In fact, USPS judicially admitted that Chisholm was discriminated against when he was denied the opportunity to apply for the finance examiner's job.

For the reasons set forth in Part II.A. of this opinion, the fact that one of Lee's claims was pre-amendment is immaterial. He did file an EEO complaint after he was not selected in 1972 in connection with the senior postal source data technician's position. He "stopped" that complaint several days after he filed it—after he was offered and received an unsolicited detail to a position as assistant safety officer. What effect that action on his part will have on his right to relief is yet to be determined, but there is nothing in the record to support USPS's statement that Lee "settled" this claim.

■ The final challenge to the individual claims also appears to be either spurious or premature. Even if there is a concession that Rushing was better qualified than McCombs vis-a-vis the customer service position, and that they were in competition against each other for the same post at the same time, we find nothing to indicate that either one of them received the job. If both were denied that opportunity as a result of racial discrimination, this

might entitle one or both of them to relief in the contemplated second stage before the Special Master. It is well settled that in appropriate circumstances back pay can be divided among a group of persons suffering from the same discriminatory conduct. *White v. Carolina Paperboard Corp.*, 564 F.2d 1073 (4th Cir. 1977).

In short, applying the applicable standard of review, we find that none of the findings of the district court relating to the challenged individual claims are clearly erroneous, and we affirm all of the determinations made on the individual claims. It should be observed also that in many instances the entitlement to individual relief and the scope and appropriateness of that relief must await decisions by the Special Master after the second stage proceedings are held. *Equal Employment Opportunity Commission v. Korn*, 662 F.2d 256 (4th Cir. 1981); *Sledge v. J. P. Stevens & Co., Inc.*, 585 F.2d 625, 637–38 (4th Cir. 1978), *cert. denied* 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979).

### V. *Relief*

■ USPS protests the propriety of several aspects of the injunctive relief granted by the district court. In particular, it contends that the district court abused its discretion in not fashioning a more narrowly drawn injunction and in ordering USPS to make "affirmative efforts" to recruit, appoint, and promote qualified black persons, using as its goal the percentage of black persons in the Charlotte USPS work force. USPS further argues that the district court acted improperly in enjoining USPS to establish the new position of EEO Employee Complaints Representative and to formulate objective criteria for administering discipline, assigning details, and granting promotions. We find no merit in USPS's objections.

Federal district courts are granted broad discretion to shape the relief for Title VII cases presented to them; this broad discretion is mandated by the highly individual nature of the relief needed to remedy dis-

---

member rated Rushing as "average and Living- ston above average . . . ."

crimination in each particular case. *Sledge v. J. P. Stevens & Co., Inc.*, 585 F.2d 625, 643 (4th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979). A district court, moreover is obligated to grant "the most complete relief possible." *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976).

In light of the district court's broad discretion and its duty to accord complete relief, we conclude that the district court did not abuse its discretion in ordering the injunctive relief challenged here. In reaching that conclusion, we are mindful of our opinion in *Sledge v. J. P. Stevens & Co., Inc.*, in which we indicated that hiring and promotion quotas should be made an element of a remedial decree in a Title VII case only under limited and compelling circumstances. 585 F.2d at 646, 649. Both the short- and long-term hiring and promotion quotas reviewed by the court and found to be inappropriate in that case were strict and mandatory. *See id.* at 644–45. In our case, however, only the long-term goal is mandatory, that goal being "to insure that blacks are represented in nonbargaining unit jobs, level 7 and above, at a ratio not more than the ratio of blacks in the top work force of USPS in Mecklenburg County." No specific date has been set for the achievement of that goal. The district court did set a three year interim schedule for USPS to follow to achieve its ultimate goal,[28] but the court was careful to define the goals for those years as a "framework" to follow and not "rigid quota[s]." Thus, there is a certain flexibility in the goals in our case that was lacking in *Sledge*.

Even if the distinction between "goal" and "quota" is merely one of semantics, *see id.* at 644 n.29, we think the circumstances of this case warrant the application of the goals imposed by the district court. Unlike the situation in *Sledge*, it is clear on the face of the record in this case that USPS's racial discrimination was "egregious, purposive, or blatant," *see id.* at 647, and that it has persisted for a substantial period of time, *see Guardians Association of New York City Police Department, Inc. v. Civil Service Commission*, 630 F.2d 79, 102 (2d Cir. 1980); either of those descriptions, standing alone, has been recognized as an indication of compelling circumstances. *See id.* at 109; *Sledge v. J. P. Stevens & Co., Inc.*, 585 F.2d 625, 647 (4th Cir. 1978). The district court found that USPS had discriminated against its black employees up until the eve of trial and that any progress that USPS made to alleviate its discrimination in promotion was brought about by the pressure of this lawsuit rather than by any real change in USPS's practices.

We are thus convinced that the goals imposed here are necessary to ensure that USPS's prior and present practices of discrimination be eliminated. Accordingly, we conclude that the district court acted well within its discretion in setting the goals and in fashioning the relief granted.

### V. *Conclusion*

Therefore, with the exception of the relief granted plaintiff Rushing, which must be vacated for reasons stated in Part II.A. of this opinion, the opinion of the district court is affirmed.

**AFFIRMED.**

---

**28.** The interim schedule sets as a goal that USPS promote an increased number of blacks in upper level jobs in a progressive fashion, the uppermost levels to be fully integrated later than the others. The goals for each year as set forth in the court's order read:

(1) a sufficient number of blacks at the Mecklenburg County facilities of USPS such that by January 1, 1982 and thereafter, the percentage of blacks in jobs levels 7–9 and in jobs levels 10–17 shall equal or exceed the percentage of blacks then existing in the work force at USPS; (2) a sufficient number of blacks at said facilities such that by January 1, 1983 and thereafter the percentage of blacks in jobs levels 18–20 shall equal or exceed the percentage of blacks then existing in the work force at USPS; and (3) a sufficient number of blacks at said facilities such that by January 1, 1984 and thereafter the percentage of blacks in the jobs level 21 and above shall equal or exceed the percentage of blacks then existing in the work force at USPS.